IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No._____

| | |
|---|---|
| TERESA CLONINGER, | )<br>)<br>)<br>) |
| Plaintiff, | )    COMPLAINT<br>)<br>) |
| v. | )<br>)<br>) |
| EVERGREEN INVESTMENT<br>SERVICES, INC. d/b/a Evergreen<br>Investments and WACHOVIA<br>CORPORATION, | )<br>)<br>)<br>)    JURY TRIAL REQUESTED |
| Defendants. | )<br>)<br>) |

Plaintiff, Teresa Cloninger (hereinafter "Ms. Cloninger" or "Plaintiff"), complaining of the Defendants, Evergreen Investment Services, Inc., (hereinafter "Evergreen" or "Defendant") and Wachovia Corporation (hereinafter "Wachovia" or "Defendant" states as follows:

## INTRODUCTION

1. This is a civil rights and employment (sex discrimination, harassment, and retaliation) and wrongful discharge action.

2. This action is brought for relief pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.,(Title VII) and NC Gen Stat § 143-422.1.

## JURISDICTION

3. Jurisdiction of this Court is provided by 28 U.S.C. §§ 1331 and 1343, and the Thirteenth Amendment to the United States Constitution; and its pendent jurisdiction over state claims.

4. On April 11, 2005, Plaintiff timely filed a sexual discrimination/hostile work environment charge with the EEOC. (See Exhibit #1).

5. On June 16, 2006, Plaintiff received a notice of her right to sue. ( See Exhibit #2)

6. Plaintiff has complied fully with all prerequisites to jurisdiction in this Court under Title VII. Jurisdiction of the Court is proper under § 706(f)(3) of Title VII, 42 U.S.C. § 2000e-5(f)(3).

## THE PARTIES

7. Plaintiff, Teresa Cloninger is a 38-year-old adult female, and therefore a member of a protected class.

8. Defendant, Evergreen Investment Services, Inc. ("Evergreen") is registered with the National Association of Securities Dealers ("NASD") as a broker/dealer-mutual fund underwriter/producer. Evergreen is listed with the Secretary of State of North Carolina as a foreign corporation headquartered in Boston Massachusetts. Evergreen Investments is a trade name for Evergreen Investment Services, Inc. Upon information and belief, Evergreen is a subsidiary of Wachovia Corporation headquartered in Charlotte, North Carolina.

9. At all relevant times, Defendants have been continuously engaged in an industry affecting commerce and has employed more than fifteen employees.

## FACTUAL ALLEGATIONS

10. On February 14, 1992, Plaintiff began work for First Union National Bank. Subsequently, First Union National Bank acquired Evergreen Investment Services, Inc. (Wachovia Bank and First Union National Bank later merged to become "Wachovia"). Plaintiff began her career as a Consumer Service Representative ("CSR").

11. In March of 1997, Plaintiff was promoted to the position of Internal Sales Consultant ("ISC") at Evergreen. Plaintiff was an exemplary employee, as evidenced by her salary increases, bonuses, and above average performance reviews. For example, the following taken from Plaintiff's 2002 Performance Evaluation is instructive: *"Teresa Cloninger has demonstrated leadership, sales success, and excellent work habits ………Overall, I feel that Teresa has performed her role as an ISC exceptionally well and I look forward to working with her in 2003."*

12. In January of 2003, Plaintiff was again promoted, this time to Team Lead/ISC. In order to obtain this position, Ms. Cloninger was forced to take one of the lowest performing territories that had not maintained an external wholesaler. Another team leader, who is male and who was appointed at the same time, was allowed to keep one of the top performing territories. This new position meant that Plaintiff was now responsible for a group of sales consultants, as well as the challenge of turning around a low-producing territory. Notwithstanding these

obstacles, Plaintiff's performance was rated "With Distinction". This rating means that Plaintiff's contributions resulted in recognizable value to Evergreen. Ms. Cloninger was one of only two females out of approximately 21 employees in this division.

13. In 2003, after Ms. Cloninger's promotion, Plaintiff was denied equal access to discuss issues that needed resolution with her direct supervisor, Mr. Slack. For example, Mr. Slack often informed Ms. Cloninger that he was too busy to meet or discuss issues with her. Notwithstanding the fact that Mr. Slack was frequently seen joking with his male colleagues, as well as practicing his putting near his desk after Ms. Cloninger would request time to speak with him. Eventually Ms. Cloninger was allowed to talk with Mr. Slack only when he took smoke breaks outside of the building, away from the other male team members. Mr. Slack's blatant disrespect in front of their male colleagues undermined Ms. Cloninger's authority as a team leader. This was the beginning of Plaintiff's sexual harassment and the making of a very hostile work environment.

14. During 2003 Plaintiff was physically harmed on a few occasions when male co-workers threw balls at her. The balls were thrown hard enough to actually leave bruises.

15. During 2003, Plaintiff was subjected to the following elements of a hostile work environment: One of Plaintiff's prized possessions (a glass award for ISC of the year) was broken by one of her male subordinates; the "f***" word was commonly used by her male co-workers in her presence; and male colleagues would make sexual innuendos (e.g., a male co-worker would describe in detail going home for lunch to get a "quickie").

16. During 2003, Ms. Cloninger did not pursue these issues because she was new in her position. Plaintiff was also trying her best to make everything work and gain the respect of her teammates. Plaintiff hoped the use of derogatory comments and the extreme use of crude and offensive language would eventually cease as she gained acceptance from her manager.

17. In 2004, the harassment did not cease. In or around April of 2004, Plaintiff began to complain openly to her boss, Patrick Slack, about being subjected to a hostile work environment. Ms. Cloninger complained of the derogatory comments made about women and the extreme use of crude and offensive language. Mr. Slack's response was "Boys will be boys" and that "the minority should adjust to the majority." Upon information and belief, no action with regard to Plaintiff's complaint was taken by Mr. Slack.

18. On or around April 21, 2004, Plaintiff told Eileen Bird, Vice President of Evergreen Investments, that she felt that she was being sexually harassed. Ms. Cloninger mentioned the negative work environment women in the sales department encountered with regard to the lack of respect and constant exposure to sexual

innuendos. Ms. Bird did not conduct an investigation, and therefore no remedial action was taken.

19. In May of 2004, Plaintiff went to Human Resources to complain about special rules that had been made regarding bonus eligibility. Specifically, she complained that these rules applied specifically to her while similarly situated males were not required to comply with the same rules. Upon information and belief, no investigation was conducted with regard to this complaint, and therefore no remedial action was taken.

20. Shortly after reporting the "special rules" incident referenced in paragraph 19, Plaintiff was threatened by her supervisor, Mr. Slack. Mr. Slack told Plaintiff that she never should have gone to Human Resources. Mr. Slack became very angry and yelled repeatedly at Plaintiff.

21. In the months of May, June and part of July 2004, Ms. Cloninger continued to bring to Mr. Slack's attention the inappropriate situations occurring on the desk and the negative impact this created in her working environment. Examples of the occurrences Ms. Cloninger sited were the telling of off-color jokes and comments of sexual, religious and political matters made within hearing distance. Also included were the use of crude and offensive language and the discussions of personal bodily functions. On multiple occasions discussions of sexual activities and innuendos of sexual activities were overheard.

22. Ms. Cloninger's repeated complaints did not change the work environment, so she began to address the inappropriate behavior of the individuals herself. This is later noted in Ms. Cloninger's review as a negative incident because she had asked the Desk members to cease and desist from their harassment. Plaintiff, in this review, was herself accused of creating a "hostile" environment on the desk for not tolerating this type of behavior.

23. In July of 2004, Mr. Slack told the Plaintiff she had to play in a waffle ball game during work hours. This was a planned event among the others, but the Plaintiff had not been notified. Plaintiff had worn a skirt into work that day. During the game, one of Plaintiff's male co-workers, in the process of tagging the Plaintiff, actually tackled and then knocked her to the ground. Plaintiff was humiliated that she had been required to participate and that this had been allowed to happen.

24. On September 23, 2004, Mr. Slack retaliated against Plaintiff, placing her on a three-month corrective action plan. Ms. Cloninger was accused of doing a number of things wrong. For example, Slack told Plaintiff that she was attempting to manipulate statistical data in order to achieve financial gain. This and other outrageous allegations were totally refuted by Plaintiff. Ms. Cloninger did inquire about the formal appeal process and was told by Mr. Slack and Ms. Bird that the same decision makers who made the original decision would be the ones to review the appeal and any attempt down this avenue would be futile. Ms. Cloninger, at that time, did not appeal for fear of being fired.

25. In January 2005, Mr. Slack gave Plaintiff a "Needs Improvement" rating on her performance review. Plaintiff completely disagreed with Mr. Slack's analysis of her performance. Plaintiff pointed out the discrepancies in her review and could not understand why she received a "needs improvement" rating. Ms. Cloninger was informed that it was subjective. Ms. Cloninger inquired as to whether she could post out to another position within the company with a "needs improvement" rating. Mr. Slack then informed Plaintiff that if she had told him she was trying to post out, then he would have given her a different review to allow her to leave. Mr. Slack, however, told Plaintiff that it was too late now to make the change. The "needs improvement" rating also made Ms. Cloninger ineligible for receipt of a yearly bonus. This was the first time that Plaintiff did not receive a bonus when bonuses were awarded.

26. On February 9, 2005, Mr. Slack finally informed Plaintiff that she was no longer on probation. Ms. Cloninger had met all the conditions to be removed from probation on December 23, 2004. However, Mr. Slack did not remove Plaintiff from probation at that time, causing Plaintiff unnecessary mental stress, as well as extreme anxiety about her job.

27. On February 15, 2005, Plaintiff, feeling depressed and humiliated because her complaints had not been addressed and because she was now being subjected to retaliation, went once again to Human Resources. Plaintiff told Human Resources that she had hired an attorney to rebut Mr. Slack's performance evaluation. Plaintiff was told to submit the rebuttal report to Eileen Bird. Additionally on February 15, Plaintiff sent, via overnight mail, the written rebuttal to Gracen Saunders, Human Resources Personnel ("HR"). In or around this same time period, Plaintiff made several calls to HR's hotline to verbalize her additional complaints. At this point in time, Plaintiff was becoming extremely concerned about losing her job because she had expressed her concerns related to working in a hostile work environment, as well as pointing out several lack of diversity issues (i.e., male sales representatives outnumbering females).

28. On February 25th 2004, Ms. Cloninger informed Ms. Bird that the hostile environment on the desk was spiraling out of control instead of improving. Ms. Cloninger made a complaint to her in private about the discussion that three male colleagues were having during work about masturbating in the restroom a short while before work. Ms. Bird made it a point to walk over to the plaintiff's desk to ask if she had left her phone in her office from when they spoken "privately" earlier about her concerns. Ms. Bird stated that she could not find a phone in her office but thought she had heard one ringing. This was right after Ms. Bird had called each of the offenders into her office to speak with them, making it apparent as to who had made the complaint she had talked to them about. After this meeting, Ms. Cloninger was threatened with physical violence by one of the males on the desk. Plaintiff called the HR hotline on the way home to report the threat. However, she was told that they could no longer take her complaints because management had made a compliant about her and she could no longer use the employee hotline. The hotline was unable to make any suggestions as to the next step Ms. Cloninger should take. At this point,

Ms. Cloninger was in an extreme state of distress and did not know what other avenues to pursue within the company to try to resolve the situation.

29. In March of 2005, Ms. Cloninger was informed quietly that Mr. Slack had covertly asked some of the male employees to file any complaints they could think of; no matter how minor or trivial. Upon hearing this, Ms. Cloninger asked for copies of ALL items in her personnel file. She spoke with Jay Biles (Evergreen's HR representative) in regards to this request. Mr. Biles' inquired as to why she would want this paperwork and Plaintiff informed him of legal advice that had been given to her advising her to acquire it. Ms. Cloninger put in writing to Mr. Slack the request for her personnel files, yet she never received a complete copy of her file. Ms. Cloninger again called the HR hotline and was extremely distraught, not knowing what direction she should now follow.

30. On March 16, 2005, Plaintiff delivered her rebuttal report to Ms. Bird. Plaintiff told Ms. Bird that she was being retaliated against for complaining of a hostile work environment. Once again, no investigation was conducted. Ms. Bird was upset that her name was mentioned in the rebuttal report. With no other options available through the company to resolve this abominable situation, Ms. Cloninger consulted the EEOC. She was advised to wait a few weeks and that if no progress or attempts to address her situation were made, then she should come back and file a formal complaint. Ms. Cloninger was still hopeful that a peaceful resolution could be reached and that she would be able to transfer to a different department and put the entire mess behind her.

31. During the first quarter of 2005, Ms. Cloninger asked a fellow male team leader for a meeting with him to discuss a business-related issue. Plaintiff told him she would make it quick. Several male employees, who overheard the conversation, made comments that this team leader was going to get a "quickie". Plaintiff told them that it was a very important meeting. All of the men, however, began to laugh. Plaintiff was once again extremely humiliated in front of several co-workers.

32. On April 11, 2005 Plaintiff, now thoroughly disgusted by the lack of response on the part of Defendants regarding her complaints about sexual harassment and retaliation, filed a formal charge with the Equal Employment Opportunity Commission ("EEOC"). Ms. Cloninger, still willing to resolve the matter, spoke with the EEOC about the possibility of Wachovia/Evergreen changing her review and allowing her to post out to another division after the compliant was filed. Ms. Cloninger explained that she has four children and could not afford to lose her job. The EEOC advised Ms. Cloninger that she would be allowed to withdraw her complaint if Wachovia/Evergreen would agree to change her review and allow her to post out for another position.

33. On April 15, 2005, Plaintiff was given the following ultimatum by HR and Ms. Bird: "Sign a letter of resignation or we will fire you for cause and make sure that you never work in the securities industry again." Plaintiff refused to sign the letter.

34. Upon information and belief, Defendants did not follow their own written guidelines for Plaintiff's termination. For example, Ms. Cloninger was not given a reason for her termination; she was simply told that she was being terminated for "unsound business decisions". Wachovia's policy states that "an employee who is involuntarily dismissed by Wachovia may not: be given severance pay, receive incentive compensation or receive any compensation for unused Paid Time Off (PTO)." The policy also states that "Wachovia provides ALL employees with an appeal process to challenge a decision to terminate their employment." Ms. Cloninger was offered a Termination and Exit Benefit of $15,000.00 if she would agree to sign away her right to sue and agree not to discuss any of the circumstances with anyone. She was never informed of the Termination Appeal Process.

35. The National Association of Securities Dealers ("NASD") requires that all employers state a reason for termination within 30 days of the termination date (e.g.; voluntary resignation, or for cause). The form to be utilized is known as a U-5 Uniform Termination Notice. All future employers can access this information in a NASD data base. It is imperative that a Registered Representative keep what is known as a "clean U-5". In other words, the U5 must not show a termination for cause. Evergreen waited to file the U-5 until July 2005, while attempting to get Ms. Cloninger to sign away her right to sue. This violated NASD policy and upon information and belief, Wachovia was fined for this violation.

36. Defendants submitted a U-5 termination report to the NASD with the following language regarding the reason for termination: VIOLATIOIN OF COMPANY POLICY - NOT SECURITIES RELATED. Defendants knew that this information was false. Defendants were merely following up on their threat that Plaintiff "would never work in this industry again".

37. To date, Plaintiff has been unable to find employment in the securities industry. There have been multiple occasions when Ms. Cloninger was in the final stages of the interviewing process and when the information on the U5 was disclosed, all further job discussions were terminated.

## FIRST FEDERAL CLAIM FOR RELIEF
[Title VII – Sex Discrimination (Harassment- Hostile Work Environment)]

38. Plaintiff incorporates by reference herein as if fully set forth herein the allegations of Paragraph 1 through 37.

39. Defendants intentionally discriminated against Ms. Cloninger in violation of 42 U.S.C. § 2000e et seq., as amended.

40. Plaintiff had performed her job satisfactorily as evidenced by performance reviews, length of employment, salary increases and bonuses.

41. Defendant's unlawful actions have caused Ms. Cloninger emotional distress, inconvenience, lost wages and benefits and other consequential damages.

## SECOND FEDERAL CLAIM FOR RELIEF
[Title VII – Retaliation]

42. Plaintiff incorporates by reference herein as if fully set forth herein the allegations of Paragraph 1 through 41.

43. Defendants intentionally discriminated against Plaintiff in violation of 42 U.S.C. §1981, as amended.

44. Once Plaintiff reported the sexual harassment to her supervisor, her supervisor began to make special rules regarding bonus eligibility that applied to Plaintiff but not to similarly situated males (i.e. other team leads) in violation of Title VII.

45. Defendants further retaliated against Plaintiff when they knowingly filed a false and defamatory reason on Plaintiff's U-5 Uniform Termination Notice in violation of Title VII.

46. Defendant has retaliated against Plaintiff and has denied her opportunities for employment on the basis of her having complained of sex discrimination and retaliation in violation of Title VII.

47. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's retaliatory practices unless and until this Court grants relief.

48. Defendant's unlawful actions have caused Ms. Cloninger emotional distress, inconvenience, lost wages and benefits, and other consequential damages.

## FIRST STATE CLAIM FOR RELIEF
(Wrongful Discharge based on Violation of Public Policy)

49. Plaintiff incorporates by reference herein as if fully set forth herein the allegations of paragraphs 1 thorough 48.

50. Plaintiff reported the sex discrimination to her supervisor, conforming to Defendant's own internal policies and procedures. In addition, Plaintiff reported the sex discrimination to Human Resources. Finally, Plaintiff reported the sex discrimination and retaliation to the EEOC.

51. Defendant wrongfully discharged Plaintiff in violation of public policy, as expressed in the Equal Employment Practices Act, (NC Gen Stat § 143-422.1).

52. Defendant's unlawful actions have caused Ms. Cloninger emotional distress, inconvenience, lost wages and benefits, and other consequential damages.

## SECOND STATE CLAIM FOR RELIEF
## (DEFAMATION LIBEL PER SE)

53. Plaintiff restates and realleges the allegations set forth in paragraphs 1 through 52 above.

54. Defendants claimed that they terminated Plaintiff for a violation of company policy. This is a false statement made by Defendants to further retaliate against Plaintiff for reporting Title VII violations. Defendant knew this statement to be false.

55. Plaintiff, at all times, was performing her job well. She did exactly what was she was told was expected and what she was instructed to do by her supervisor.

56. This false information has been disseminated to all future employers via NASD CRD system.

57. Defendants have acted in a willful and wanton manner, with total disregard for Plaintiff's professional reputation.

58. Plaintiff has been proximately injured as a result of Defendant's actions, in that she has lost prospective earnings. Plaintiff is entitled to recover the amount she would have earned but for the defamation.

59. The defamatory statement(s) have prevented Plaintiff from obtaining comparable employment within the securities industry.

60. Plaintiff is entitled to recover actual damages incurred and punitive damages arising out of the actions of Defendant. As a direct and proximate cause of the defamation, Plaintiff has also suffered embarrassment, public humiliation and irreparable damage to her name and professional reputation.

WHEREFORE Plaintiff respectfully requests:

a. All wages and benefits she would have received but for the discrimination;

b. Declaring that the acts and practices complained of herein are in violation of Title VII;

c. Enjoining and permanently restraining these violations of Title VII;

d. Directing Defendant to place Plaintiff in the position she would have occupied but for defendant's discriminatory and retaliatory treatment of her;

e. Compensatory damages;

f. Punitive Damages;

g. Attorney's fees and costs as provided by §706(k) of Title VII, 42 U.S.C.§ 2000e6(k);

h. Declaring that the acts and practices complained of herein are a violation of NC Gen Stat NC Gen Stat § 143-422.1.

i. Plaintiff have and recover all damages related to her defamation claim, including punitive damages.

j. All matters triable by a jury be so tried.

k. Granting such other and further relief as this Court deems necessary and proper.

Respectfully submitted this 8th day of September, 2006.

s/Darryll W. Bolduc
The Bolduc Law Firm, PLLC
112 South Tryon St.- Suite 1270
Charlotte, NC 28284
Attorney for Plaintiff
(704) 927-1200
(704) 927-1219 fax
Email: dbolduc@bolduclaw.com
NC State Bar No. 31406

## VERIFICATION

Teresa Cloninger, being first duly sworn, deposes and says that she has read the foregoing Complaint and knows the contents thereof; that the statements contained herein are true of her own knowledge, except matters and things set forth upon information and belief; and as to those such matters and things, she believes them to be true.

*Teresa Cloninger*

Sworn to and subscribed before me this 1st day of September, 2006.

*Notary Public*

My Commission Expires: April 27, 2009

"OFFICIAL SEAL"
Notary Public, North Carolina
County of Mecklenburg
J. L. Luethye
My Commission Expires 4/27/2009